[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Mindful of the consolidation of both of these lawsuits and the issues therein, the court feels it is appropriate to first set forth the status of the respective files and pleadings contained therein.
I. Dennis Steiger, et al v. Town of Old Lyme, et al
This lawsuit came to this court by complaint dated June 7, 1989 and returnable June 27, 1989, sounding in three counts claiming negligence in the inspection of certain premises known as 293 Boston Post Road, Old Lyme, incident to the issuance of a certificate of occupancy by the defendant building inspector, Joseph Hart, and in the issuance of a subsurface discharge permit for a septic system by the defendant Frank Kneen, Town Sanitarian.
The defendant Town of Old Lyme was alleged to be liable for said negligence pursuant to Connecticut General Statutes 7-465.
The complaint claimed damages. On July 12, 1989, counsel appeared for all named defendants. Thereafter, certain motions were filed.
On September 5, 1989, the plaintiffs filed an Amended Complaint making substantially the same claims against the same CT Page 1949 defendants and claiming damages.
Thereafter, the plaintiffs filed another Amended Complaint dated October 5, 1989, making substantially the same claims against the same defendants and adding a claim of gross negligence as to the defendant Hart.
Thereafter, an Answer to the Amended Complaint dated November 21, 1989 was filed including two special defenses.
Thereafter, a Reply to the Special Defenses was filed dated November 27, 1989.
On March 7, 1991, a Motion to Consolidate was filed by the defendants seeking to consolidate this lawsuit with another suit entitled Dennis I. Steiger, et ux v. J. S. Builders, Inc., et al, Docket No. CV90-515733S.
On June 18, 1991, new counsel appeared for the plaintiffs.
Thereafter, the plaintiffs filed on September 10, 1991 a third Amended Complaint in six counts against Hart, Kneen and the Town of Old Lyme again claiming negligence and, in addition, reckless indifference by the defendants Hart and Kneen and the Town of Old Lyme.
In this third Amended Complaint, the plaintiffs claim damages for costs of repair, loss of use of premises, emotional distress, attorney's fees for reckless indifference, costs and other relief.
On January 29, 1992, a motion for physical inspection of the premises was made.
On July 20, 1992, new counsel appeared for the defendants Hart, Kneen and the Town of Old Lyme.
Thereafter, on October 15, 1992, the defendants Hart, Kneen and the Town of Old Lyme filed an answer to the third Amended Complaint and thirteen special defenses and the pleadings were finally closed.
 II. Dennis Steiger, et ux v. J. S. Builders, Inc., Blue Spruce Developers, Inc., CT Page 1950 Tradewind Developers, Inc., John I. Slezak, Louisette Slezak and Susan Moreau
This lawsuit came to this court by complaint dated August 27, 1990, returnable September 25, 1990, sounding in eleven counts.
The first count against J. S. Builders, Inc. claimed breach of contract, failure to perform the work required under the contract and defective work performed in an unworkmanlike nature.
The second count against J. S. Builders, Inc. claimed a breach of warranties of Connecticut General Statutes 47-118
and 47-121.
The third count against J. S. Builders, Inc., Blue Spruce Developers, Inc., John I. Slezak, Louisette Slezak and Susan Moreau claimed the corporate defendants had no separate mind, will or existence and that control of the same was to commit fraud and wrongdoing.
The fourth count against Blue Spruce Developers, Inc. claimed breach of warranties under 47-118 and 47-121. The fifth count against John I. Slezak individually claimed that Slezak had complete control over the corporate defendants so that the corporations had no separate mind or will and were used to commit fraud and wrongdoing.
The sixth count against Tradewind Developers, Inc. incorporates paragraphs 1 through 9 of count three and claims the defendant Tradewind is liable to plaintiffs.
The seventh count against Tradewind Developers, Inc. incorporates paragraphs 1 through 9 of count three and claims a breach of warranties of Connecticut General Statutes 47-118
and 47-121.
Count eight against the defendant John I. Slezak incorporates paragraphs 1 through 8 of counts two and nine and 10 of count three and claims a breach of Connecticut General Statutes 47-118 and 47-121.
Count nine against Louisette Slezak, J. S. Builders, Inc., Blue Spruce Developers, Inc., Tradewind Developers, Inc., CT Page 1951 John I. Slezak and Susan Moreau incorporates paragraphs 1 through 8 of count three and recites a claim to convey a driveway located within the boundaries of plaintiffs' property and a failure to do so.
Count ten is directed against the same defendants as in count nine and claims that the subject driveway referred to in count nine is on property of the defendants. Count eleven is directed against the same defendants as in count nine and claims an unfair trade practice in violation of 42-110a et seq.
The plaintiff claims monetary damages, an order conveying the driveway premises to the plaintiff, declaratory relief as concerns a claim of right of way over property of the `defendants,' attorney's fees pursuant to 42-110, damages, and such other relief as the court may deem fair and equitable.
Thereafter, on September 25, 1990, an appearance was filed by counsel on behalf of all defendants.
Thereafter, certain defendants filed a Request to Revise on October 22, 1990.
Thereafter, the court, Teller, J., ruled on various objections to the Request to Revise on January 7, 1991.
Thereafter, certain objections were made by various defendants as concerns requests for production, inspection and copying.
Thereafter, a Motion to Compel made by plaintiff as to providing various documents, etc., by defendants was granted by the court, Teller, J., on February 4, 1991.
Thereafter, plaintiff filed an Amended Complaint revising paragraph 19 of count three on February 15, 1991.
Thereafter, on April 29, 1991, Teller, J. granted plaintiffs' application for a prejudgment remedy as to the corporate defendants.
Thereafter, a Request for Leave to Amend the Plaintiffs' Claim for Relief was denied by the court, Hurley, J., on May 28, 1991. CT Page 1952
Thereafter, a motion for viewing the premises was filed on May 21, 1991 by plaintiff.
Thereafter, a notice of intent to use videotaped evidence was filed dated May 21, 1991.
Thereafter, a Motion for Default for Failure to Appear, defense counsel having been granted leave to withdraw, was granted against the defendants.
Thereafter, incident to a request for a further prejudgment remedy, the court, Purtill, J., granted the same as to the defendant Louisette Slezak.
Thereafter, counsel appeared for the defendants on December 4, 1991.
Thereafter, plaintiffs filed a Motion for Default and Preclusion of Evidence against all defendants in this action on August 25, 1992 and the court, Teller, J., granted the same on November 9, 1992 to the following effect. "Granted as to default as to all defendants, grant the motion to preclude as to any evidence not already disclosed."
Thereafter, the court, Hendel, J., granted a prejudgment remedy against the defendant Susan Moreau on February 1, 1993.
Thereafter, Plaintiffs' Motion to Strike from the Trial List this lawsuit filed February 8, 1993 was granted on March 1, 1993 and this lawsuit was then to be a hearing in damages only, claim for which was filed March 5, 1993.
Thereafter, a Motion to Set Aside the Default as to the Defendants John and Louisette Slezak was denied by the court, Teller, J., on March 29, 1993.
A similar motion to set aside as to the defendant Moreau was denied June 9, 1993 by Hurley, J.
Trial to the court commenced on October 5, 1993 and continued on the following dates: October 6, 1993, October 13, 1993, October 19, 1993, October 20, 1993, October 26, 1993, November 2, 1993, November 3, 1993, CT Page 1953 November 9, 1993, November 10, 1993, November 17, 1993, November 23, 1993, and November 24, 1993.
The court makes the following findings of fact.
The plaintiff Dennis Steiger is employed by Vandenburg Foods and has been so employed for the last fifteen years as package development manager. Dennis Steiger has a bachelor of science degree in mechanical engineering. His current annual salary is substantial. Dennis Steiger first met the defendant Slezak through Genovali Realty in 1986.
Dennis Steiger was a resident of Westbrook at the time: The purchase of property in Westbrook by Steiger was discussed with John Slezak at the first meeting but led nowhere.
Later in 1986, Dennis Steiger met the defendant Slezak again at which time Slezak mentioned three lots in the Town of Old Lyme.
Some discussion was had between Dennis Steiger and Slezak, plans were exhibited and Dennis Steiger was invited to come and see the lot at 293 Boston Post Road.
A discussion was had at this visit as to the clearing or removal of trees and the location of a proposed driveway and the proposed residence.
There was also a discussion concerning the plans and window locations noted in the plans. Dennis Steiger gave a copy of the proposed contract for the purchase of the house and lot to his attorney to review.
A building agreement was executed on February 13, 1987 by and between the plaintiffs Carol J. Steiger and Dennis I. Steiger and the defendant J. S. Builders, Inc. concerning the construction of a dwelling on Boston Post Road, Old Lyme. See Plaintiffs' Exhibit W.
The agreement provided for the construction of a dwelling in accordance with plans and specifications, a two-story gambrel-type roof residence with basement. See Plaintiffs' Exhibit A and Defendants' Exhibit 9. CT Page 1954
The purchase price was $185,117. The agreement provided for delivery of the premises in a "broom clean" condition and builder to provide certificate of occupancy.
The agreement provided, as set forth in Plaintiffs' Exhibit W, page 3, paragraph 8, that payment of the purchase price, issuance of the CO and sanitary permit and the taking of occupancy shall be "conclusive evidence of acceptance of said contract as substantially complete."
Schedule A, a part of Exhibit W, covered items pertaining to cabinets, painting and oil heating and five typed sheets covering construction requirements.
Schedule B, a part of Exhibit W, provided for a mortgage condition and a deposit of $18,511.70. The agreement, Exhibit W, page 1, paragraph 1, provided for substantial completion of the residence by July 30, 1987, but did not specify a precise closing date.
A closing date of title was had on October 1, 1987, wherein the defendant Blue Spruce Developers, Inc. conveyed title by warranty deed survivorship form to Dennis I. Steiger and Carol J. Steiger of lot 293 Boston Post Road. See Old Lyme Land Records Book 173, page 986. See Plaintiffs' Exhibit AAA. The premises were conveyed together with a right of way over a portion of lot 295, all as set forth in the deed.
See also settlement statement concerning said closing, Defendant's Exhibit 7.
The plaintiffs Steiger were represented by counsel at the closing as was the defendant Blue Spruce Developers, Inc.
See Defendants' Exhibit 3 for funds held in escrow by plaintiffs' attorney in the amount of $3,000.
Prior to the closing, plaintiffs purchased appliances for the new residence, did some painting therein and purchased carpeting on their own.
Prior to the closing, the plaintiffs had visited the site several times and observed the various stages of construction. CT Page 1955
The plaintiffs secured a first mortgage on the premises from GMAC in the amount of $90,000 and the mortgagee GMAC through its agents inspected the premises prior to closing and approved the same for its purposes.
The plaintiffs, prior to the Old Lyme purchase, had sold their residence in Westbrook and were required to vacate.
The plaintiffs were required to vacate the Westbrook property seventy-two hours after that sale.
The document purporting to be a certificate of occupancy as to the Old Lyme residence was given to the plaintiffs at the time of closing, October 1, 1987, by their attorney.
Plaintiffs actually occupied the Old Lyme residence October 3, 1987.
A plumber by the name of Rourke was at the premises for several days after the closing relative to problems with the heating system and efforts to have the same operate properly.
On November 3, 1987, Economy Oil Company of Essex was called in by plaintiffs to correct or modify problems with the heating system. An invoice from Economy Oil Company was rendered in the amount of $791.08 with an explanatory letter, see Defendants' Exhibit 9, which was paid out of the escrow account. See also letter of Dennis Steiger to defendant J. S. Builders dated October 15, 1987, Plaintiffs' Exhibit V.
At the time of closing, a list of items to be accomplished concerning the residence was written out in hand which formed the basis for the escrow account. This document was called a punch list. See Plaintiffs' Exhibit T.
In the latter part of October 1987, plaintiffs contacted a Mr. Bell at Occupational Licensing for the State of Connecticut relative to complaints as to the subject premises and its construction. As a result thereof, an inspection of the subject premises was conducted on October 30, 1987 by Lawrence Acquarulo and Antonio Alves, assistant state building inspectors. Also present were Joseph Hart, Old Lyme Building Official, and Lawrence Machia, Inspector, Department of CT Page 1956 Consumer Protection. The results of the inspection are set forth in Plaintiffs' Exhibit Q. The deficiencies noted in Exhibit Q are of a plumbing and electrical nature.
Plaintiffs secured an estimate from Jack Lamb, an electrical contractor of Old Lyme, to correct any and all electrical deficiencies dated November 30, 1987 in the amount of $1,242, but the work was never authorized nor done. Plaintiffs secured an estimate dated December 2, 1987 from New Concepts Plumbing and Heating, Inc. of Cheshire to correct and/or replace the plumbing system in the amount of $7,728.63, but the work was never authorized nor performed. See Plaintiffs' Exhibit HH.
Although plaintiffs claimed to be having problems with the septic system, the tank was never pumped out for over five years, and after a recent pump out, no problems were experienced.
Before the commencement of the suit in both the matter of Steiger v. Old Lyme, Hart and Kneen and Steiger v. J. S. Slezak, Inc., et al, the plaintiffs took out a second mortgage on their Old Lyme residence for the purpose of legal fees and repairs.
The New England Savings Bank, second mortgagee, valued the subject premises at that time at $225,000. Said mortgage was for $35,000. A refinance of the GMAC mortgage had been refused by GMAC.
On one occasion, plaintiffs contacted the defendant Hart regarding the relocation of a thermostat electronic wire. A satisfactory response was secured and the change in location effected.
At the closing of title, there was no discussion regarding building codes or compliance although all parties were represented by counsel.
At the time of closing of the plaintiffs' GMAC mortgage, plaintiffs never advised their mortgagee that there were any problems with the residence, incomplete work or the necessity for an escrow.
Prior to the closing of title, a water sample from CT Page 1957 the well on the subject premises had been taken and examined by Eastern Analytical Laboratory of Old Saybrook and met the guidelines for approval. See Plaintiffs' Exhibit N. See also Plaintiffs' Exhibit XX, well drilling permit and approval.
Subsequently, to wit, on January 15, 1990, a water sample was taken and tested by the same laboratory and found not to meet the guidelines for approval. See Plaintiffs' Exhibit S.
The plaintiff Carol Steiger made frequent visits to the building site prior to closing including on her birthday of June 19, 1987 and the July Fourth weekend.
After the closing date, Carol Steiger checked with Hart's office to see if Rourke was a licensed plumber. Carol Steiger spoke with the office secretary Katherine Greene.
Carol Steiger, some time after the closing, requested a copy of the septic plan from the office of the defendant Kneen and was provided with a complete plan. Plaintiffs were never in the office of the defendant Kneen prior to closing.
The defendant Joseph M. Hart has been the building official inspector for the Town of Old Lyme since 1977. Hart is also the zoning enforcement official and fire marshall for Old Lyme. Hart served with the Connecticut State Police from 1947 to 1974 attaining the rank of captain. Hart was a construction specialist for the state police and was the Eastern Division commander. Hart was deputy state fire marshall whose duties included the responsibility for design approval and construction of new facilities.
Prior to his employment by the town, Hart had worked for Diamond National Corporation in sales and allied construction activities for three years. Hart had participated in seminars while employed by Diamond National in residential and commercial construction and product use. Hart had been a builder in the Town of Canterbury in years past. Hart, in his capacity as building official for Old Lyme, had attended many seminars around the state. Hart did not attend the seminar on the issue of discontinuing the use of lead solder.
Hart had a staff assistant, Mrs. Greene. Hart was required to take a test for his position as building inspector. CT Page 1958 After Hart's appointment as building inspector, he took a twelve-week course in Stratford under the aegis of the state.
On Hart's first inspection of the premises at 293 Boston Post Road, little plumbing had been done, the electrical work was well along, the framing, as observed, had no defects, framing had been done by one of the best framers in the area, and the contractor was to call Hart when the plumbing was ready for inspection.
Heating was not ready for inspection on the first visit.
Subject premises have two full baths on the second floor and a half bath on the first floor.
At the time of the issuance of the certificate of zoning compliance, the plumber Rourke told Hart that certain plumbing was to be finished by the new owners.
Hart did not know or learn of Rourke being unlicensed until after the issuance of the certificate and not until the state inspection requested by plaintiffs. Hart issued the certificate with the understanding that any deficiencies or work remaining to be done as to plumbing would be done by the plumber or the homeowner.
Hart had never dealt with the defendant Slezak prior to `this building' project.
Hart intended to inspect the premises at least once more after the issuance of the certificate for the purpose of issuing the green copy of the multi BOCA form certificate of occupancy as to compliance with the building code.
The estimated cost on the building permit taken out as to the subject residence was $127,000.
Hart noted during the rough inspection proper window installation. Plaintiffs' never called Hart for any final inspection. Of the subject premises.
Hart conducted three inspections of the subject premises, including a furnace start up examination. CT Page 1959
Each certificate of occupancy issued by Hart's office is signed by Hart.
The green copy of the multi form BOCA permit forms constitutes the certificate of occupancy as to code compliance. Exhibit P, the certificate of zoning compliance, was a form made up in years past by zoning enforcement personnel.
Hart has never signed a certificate of occupancy on BOCA forms for the Steiger residence.
Banking institutions would not accept temporary certificates and Exhibit P was evolved to satisfy bank requirements for closings.
Plaintiffs and the defendant seller required a certificate to close the mortgage with the bank.
Hart never intended to sign the green BOCA form certificate of occupancy until he had been called and a final inspection made.
When Hart signed Exhibit P, the certificate of zoning compliance, it was not intended to indicate that the premises met the building code. See Plaintiffs' Exhibit P for its precise wording.
Hart never issued any eviction order to the plaintiffs.
The building code allows an individual homeowner to purchase a home and complete same at their leisure and according to their finances as long as certain basic requirements are met.
Hart has done 30 to 40 hours of training in code enforcement each year in his present position. In 1986-1987, Hart inspected as many as 80 to 90 homes each year in Old Lyme.
The certificate issued, Exhibit P, indicates compliance with zoning regulations, not the building code.
The defendant Frank Kneen has been the director of health for Old Lyme, since 1975. CT Page 1960
Prior to 1975, Kneen was sanitarian for the Town of Milford.
Kneen holds a B.S. in physical medicine and an M.S. in biology. Kneen is a registered physical therapist, registered sanitarian and registered pest regulator.
Kneen's duties as sanitarian and health officer were combined in 1975.
Kneen has recently completed a five-month training program at Southern Connecticut State University. Kneen is knowledgeable as to the inspection of sanitary systems and their mechanics.
An engineered system was required for the Steiger site. The system, as designed, was reviewed by Radcliffe Engineering Company at Kneen's request. The original request for the septic system layout was denied by Kneen.
Kneen dug test holes on the subject premises prior to requesting an engineered layout. Kneen went on the premises and viewed the system as installed albeit briefly. Kneen found the system to have been installed correctly and that it would function properly and decided to approve it.
Kneen subsequently contacted the town attorney when he learned that the defendant Slezak had installed the system and was not licensed to do so. Kneen observed the system to have been built according to the engineered plan.
Kneen has supervised or inspected over 2,700 septic systems during his term in office. The system must be cleaned every three or four years to continue proper functioning by way of a pump out. Kneen has assisted in the drafting of a portion of the state code on sewers and sanitary systems and wells.
In order for a homeowner to move in, at least one bath must be operational and complete and a homeowner may then finish or cause to be finished the additional plumbing. (Testimony of plaintiffs' expert Alves.)
The washing machine hookup, as modified by plaintiffs, violated code and created sewer gas or odor problems. CT Page 1961
Hart's office usually issued permits in sequence:
A. foundation
B. chimney and fireplace
C. residence itself
The first examination is in the field. The permit fees are to self fund the building department. A cardboard copy of the initial permit is issued to the builder and required to be posted on the premises or site.
If a homeowner intends to do certain work on their premises, they are required to take out a permit.
A cane-type tool was carried by Hart to test soil compaction on various sites including subject site.
If the plaintiffs had contacted Hart and alerted him to the effect that they did not intend to complete the work, Hart would have required the builder to complete all the work before issuing any certificate of any kind.
Anthony Komarnski, a registered land surveyor, did an A-2 survey of plaintiffs' premises late in 1987. The purpose of the survey was to define the lot boundaries and any easements thereon or appurtenant thereto.
It was determined that a portion of plaintiffs' defined driveway was on adjacent premises of the defendant Slezak. The cost of the survey was $1,450.
Hart's experience had been that banks would not accept any certificate entitled "temporary" for mortgage closing purposes. The certificate signed by Hart was for zoning compliance and not a certificate of occupancy.
The defendant Kneen had denied the original request for a septic system installation located behind the home.
Plaintiffs' expert, Marvin Schaefer, inspected the Old Lyme premises. Schaefer acknowledged he does not do code inspections. Schaefer testified there was no water in the CT Page 1962 basement when he inspected the premises. To many of the questions propounded to plaintiffs' expert Schaefer, the response was "I can't recall"
Plaintiffs' expert Schaefer testified that the Crestline windows in the house were not defective as to seals and that the windows were plumb and the court so finds.
Plaintiffs' expert Schaefer testified that the foundation of the subject premises was structurally sound and the court so finds.
Plaintiffs' expert Schaefer testified that the pitch of the driveway did not contribute to any water problem in the basement and the court so finds.
The witness Fred Grillo is a self-employed builder and remodeler and is licensed in Connecticut and Rhode Island as a general contractor. Grillo does not hold any sanitary license. Grillo inspected the subject premises and a video of the same was made at that time. Grillo prepared estimates for work on the subject premises covering and including a new roof, new windows, front entrance supporting footing, footing drains, grading, new septic system, new garage floor, snap tie repairs in foundation, new hatchway main carrier beam repairs, new plumbing system, new furnace, electrical work, new carpeting and the sheetrock work. Grillo acknowledged that the septic system should be pumped every two years. Grillo's estimates were to please the customer, not to correct alleged code violations. Up to the time of trial, Grillo had received $2,200 in fees for visits to premises and estimates.
The witness, Richard Layton, is a Phase I licensed sanitarian in Connecticut and sanitarian for the Town of Deep River and familiar with the Connecticut Building Codes.
The CABO code is used as concerns residential one and two-family dwellings.
Buildings officials in various Connecticut towns rely on each other concerning code inspection and enforcement. No courses or administration of CABO is presently available under the aegis of the state.
Local building officials do not enforce licensing CT Page 1963 requirements as to artisans. Layton has reported four or five licensing problems as to artisans to the state and has never received recognition of any of these letters of notice. Richard Layton is the building official for the Towns of Essex, Killingworth, Deep River and the Borough of Fenwick. Richard Layton is fire marshall for the Towns of Essex and Deep River. Richard Layton was certified as a building inspector by the state in 1987".
In his years as building inspector, Layton has not seen a custom owner home completely finished when the owner moved in.
Discretion and judgment is exercised by local building officials on a daily basis. On occasion, the contractor's word is accepted by the building official without further inspection. Building officials frequently authorize a subordinate to affix signatures to documents when appropriate. Building officials are concerned with safety and compliance with code and not appearances.
Transits or levels or surveying equipment are not provided to building inspectors.
Many homes show cracks in sheetrock due to shrinkage of framing, in that most lumber today is not being properly dried.
Plans for the subject premises did not require footing drains. Any problems due to snap ties in the foundation wall can be cured by the application of polymer cement rendering excavation for footing drains unnecessary.
Bilco basement doors must be sealed every two to three years.
Layton has issued 200 to 300 certificates of occupancy per year in the various towns that he serves.
Requirements as to roof shingle overhang are not provided for in the CABO code.
There are no instructions on reporting unlicensed contractors in the CABO code. CT Page 1964
Footing drains do not solve problems as to rainfall but help to control mottling hydraulic action.
On one occasion, Layton contacted Dan Tierney, a state employee, having to do with code enforcement for a definition of "substantial compliance" and received no answer or advice.
Layton has taken 50 to 100 courses to keep abreast of code enforcement.
The type and form of certificate of occupancy given in the Towns of Killingworth, Deep River and Essex varies.
In Deep River and Killingworth, the green copy of the BOCA form is given to the proper party homeowner.
The witness, William Allen, is a general contractor. Allen builds homes, does fire damage repairs and remodeling. Allen has been building homes since 1963 and formed his corporation in 1969. Allen has done interior demolition and repair. Allen is a registered remodeling contractor and viewed, inspected and toured the Steiger residence in company with others on October 6, 1993. Allen prepared a detailed five-page report and estimate concerning the subject premises. See Defendants' Exhibit 17.
Exhibit 17 covered certain replumbing work and the removal of sheetrock to perform the same, the removal and reinstallation of certain vinyl siding to accomplish the replumbing, repainting, work to allow new heat pipes, basement girder blocking, corrective work as to the fireplace hearth, site work, septic system, footing drains, foundation snap tie filling, installation of front step, sonotubes and miscellaneous. The total of Exhibit 17, including overhead, profit and tax is $22,752.
In addition, Allen can correct any roof overhang shingle deficiency for either $920 or $720, depending on the procedure used.
Allen can perform all necessary work while the premises continue to be owner occupied.
Marilyn Swaney is employed by the health department CT Page 1965 of the Town of Old Lyme and has been so employed since March 6, 1987 and maintains records concerning septic systems and a log incident thereto. See Exhibit 19 and Exhibit 20.
Carol Steiger called Marilyn Swaney's office on September 16, 1987 regarding a problem with the builder. See Defendant's Exhibit 19.
A copy of the septic system plans were given to Carol Steiger by the Old Lyme Health Department.
David J. McCarthy is a plumbing and heating contractor. McCarthy graduated from a technical school receiving a diploma in heating and plumbing. McCarthy served an apprenticeship with different employees. McCarthy holds a State of Connecticut P-1 license in plumbing and an S-2 license. McCarthy is licensed in Rhode Island as a journeyman P-1. McCarthy's associate, Bagwell, holds a P-2 and S-2 license in Connecticut. McCarthy viewed, inspected and toured the subject premises with the court, counsel and others on October 6, 1993. McCarthy prepared an estimate involving the subject premises. See Defendant's Exhibit 21. The estimate was broken down into five different categories.
The defendant Town of Old Lyme has been sued by the plaintiffs only under the indemnification provisions of Connecticut General Statutes 7-465 regarding claims against municipal employees.
In June 1987, J S Builders applied for a building permit to construct the house. (See Exhibit F.) The building permit was issued to J S Builders by Joseph Hart. (See Exhibit F.)
A subcontractor or employee of J S Builders, Eugene Rourke, applied for a plumbing permit to install the plumbing systems at the house. His application showed a license number which was not a valid number. (See Exhibit H.)
The plumbing permit was issued by the late Mrs. Katherine Greene, an employee of the Town who was working under Joseph Hart's supervision. She issued the permit after reviewing the application, by applying Joseph Hart's signature by facsimile stamp to the permit. Mrs. Greene was authorized to issue plumbing permits under this procedure if she was CT Page 1966 satisfied that the applicant was a licensed plumber and the application appeared to her to be in order.
The Town of Old-Lyme's procedure for issuing plumbing. permits was reasonable. Katherine Greene was a reasonably competent employee.
Joseph Hart never saw the plumbing permit or application before the Steigers purchased the house.
During the course of construction of the house, Joseph Hart conducted inspections of the foundation footings, the chimney, the rough framing and the rough electrical work. He was satisfied with the quality of the construction of the house with respect to each of these inspections.
When Mr. Hart conducted the rough framing and electrical inspections, he also had intended to conduct a rough plumbing inspection. The plumbing was not yet installed, however.
Mr. Hart therefore instructed John Slezak, the principal of J S Builders, Inc., to call him back when the rough plumbing was ready for inspection.
The builder did not subsequently call Mr. Hart back to inspect the rough plumbing installation, and Mr. Hart did not recall that he had not conducted that inspection.
In the second week of September 1987, the builder called Mr. Hart to conduct a final inspection of the house.
Mr. Hart's first "final" inspection was on September 8, 1987. (Exhibit D.) At that time, Mr. Hart found that the house was not ready. He made notes on his copy of the building plans (Exhibit B) regarding some areas of work that needed to be completed.
Shortly after the September 8th inspection, Mr. Hart returned to the house on his own initiative to inspect the progress of the work. He found that some of the items he had requested had been corrected or completed.
Mr. Hart returned for a third "final" inspection at the request of the builder. At that time, he found that the CT Page 1967 work was still progressing but that the plumbing in the house was incomplete
Mr. Hart suspended his inspection at that point because it was not feasible to inspect the work before it was completed.
Mr. Hart pointed out to Eugene Rourke, who was present at the time working on the plumbing, that the plumbing was not complete and therefore the house was still not ready for its final inspection.
Mr. Rourke responded that John Slezak and the Steigers had agreed that the Steigers would buy the house before the plumbing was complete and finish it themselves, in order to save money. Mr. Rourke also indicated that the Steigers were in a great rush to purchase the house.
After his last inspection, Mr. Hart knew that the house was not ready for a building code certificate of occupancy.
Mr. Hart knew that the house did, however, meet the zoning requirements of the Old Lyme Zoning Regulations.
Mr. Hart believed that the Steigers were under great pressure to close on the house as soon as possible. That belief was correct.
Mr. Hart did not believe that the Steigers were at any risk to their health or safety in moving into the house in the condition that it was in at the time.
Mr. Hart, in his capacity of building official, did not issue a certificate of occupancy for the house.
Mr. Hart, in his capacity as zoning enforcement officer, issued the certificate of zoning compliance.
The certificate of zoning compliance (Exhibit P) indicates that it is signed by the zoning enforcement officer, not by the building official. Also, Exhibit P does not contain the references to compliance with the state building code that is required of certificates of occupancy under Connecticut law. CT Page 1968
Under the procedures followed by the Town of Old Lyme in 1987, a building code certificate of occupancy was issued only when the green-colored copy of the BOCA building permit forms was signed or initialed in the upper right hand corner and dated.
Mr. Hart intended to postpone issuance of the building code certificate of occupancy for the Steigers' house until he returned for a final inspection and found that the house complied with the building code.
There was only one instance of contact between the Steigers and Mr. Hart prior to their purchase of the house.
The Steigers never contacted Mr. Hart to ask whether the house complied with the building code.
The Steigers never contacted Mr. Hart to ask whether a certificate of occupancy had been issued.
The Steigers never contacted Mr. Hart to ask why he had issued the certificate of zoning compliance (Exhibit P) when the house was obviously not complete.
The building permit and certificate of occupancy forms used by the Town of Old Lyme building department are standard forms issued by the Building Officials and Code Administrators, International, Inc., which promulgates the BOCA building code adopted in Connecticut. (Exhibit F, DD.)
Different towns in Connecticut have followed different practices in documenting certificates of occupancy. Some towns print separate certificate of occupancy forms for their own use, and some use the same BOCA forms which Old Lyme used. Some towns have issued certificates of occupancy to the owner of the house while others kept the certificate of occupancy in the town files.
On the morning of their closing, the Steigers inspected the house.
In the course of the inspection, Mr. Steiger prepared a list of work which was either incomplete or needed correction. (Exhibit T.) CT Page 1969 Some of the items on the escrow list were obvious, but others reflected some sophistication and knowledge in matters `Of real estate' and matters and house construction.
The Steigers decided to buy the house even though they could see that it was not complete.
The Steigers' mortgage lender inspected the house before the closing.
In spite of the many items of incomplete or incorrect work, the plaintiffs proceeded with the closing. During the closing, the Steigers and their attorney were presented with Exhibit P, and concluded that that was a certificate of occupancy for building code purposes. They did not contact Mr. Hart to confirm that.
During the closing, the Steigers and their attorney negotiated an escrow of $3,000 which their attorney held back from the closing proceeds in order to secure correction or completion of the work on the escrow list. Exhibit T.
The Steigers did not seek a postponement of the closing in order to allow an inspection of their house by a professional house inspector or by a contractor.
The Steigers did not contact a contractor before or during the closing to ask whether the $3,000 escrow was a reasonable amount to pay for a contractor to perform the work on the list if J S Builders, Inc. did not do the work.
After the Steigers purchased the house, the builder continued work on some of the items which were defective or incomplete. (Exhibit U.)
Before the builder had completed the work on the house to the Steigers' satisfaction, he and the Steigers had a dispute over continued work by Eugene Rourke, the unlicensed plumber. As a result, the builder did not complete the work he and the Steigers had agreed to. (Exhibit U.)
The Steigers then notified the builder that they were going to hire their own plumber to finish the work. (Exhibit U.) CT Page 1970
The Steigers hired a heating contractor, Economy Oil, to correct or complete the work on the heating system. (Exhibit 9.)
Economy Oil corrected some of the work required by the heating system but not all of it, and left certain code violations (a bullheaded tee and heat pipes without sufficient hangers). (Exhibits 9 and Q.)
The Steigers did not hire any plumbers other than Economy Oil to complete the house and did not hire any contractors to do other work on the house.
The only work that the Steigers have done themselves to complete or correct work in the house was to change the drain outlet for the washing machine in their basement. Mr. Steiger installed an outlet fitting that did not have a trap and which was the wrong kind of material, both of which were code violations.
The plaintiffs complained of an improper ground in their electrical system. That work could have been corrected for roughly $3 to $5 and could have been corrected by the Steigers themselves. The Steigers have lived in the house for six years without correcting the improper ground in their electrical system.
The Steigers complained of septic gases in their house, which escaped through unplugged drain openings in the basement and the second floor main bath and through the empty main bath toilet and bathtub.
The Steigers could have cured all of the known causes of septic gases in the basement by putting an expandable plug cap in the original washer outlet near the basement ceiling and by installing a proper washer outlet fitting instead of the improper one installed by Mr. Steiger.
The Steigers could have corrected all of the known causes of septic gas in the second floor main bath by putting an expandable plug in the drain pipe under the sink and by putting water or vegetable oil in the traps in the toilet and bathtub.
The measures necessary to block these sources of CT Page 1971 septic gas entailed minimal expense and could have been performed by the Steigers themselves.
The Steigers were aware of the importance of sealing off the septic gases and correcting the electrical ground because they had been told that by their own expert witness, Mr. Alves.
At the request of the Steigers, representatives of the state building department inspected their house in October 1987. After conducting the inspection and issuing a letter notifying the Steigers of the violations, the state building department took no steps to see that the building code violations were corrected.
Joseph Hart did not have the authority to enter an order that J S Builders complete the house after title passed to the Steigers.
On June 10, 1987, John Slezak applied for a septic system installation permit from the Old Lyme Health Department. The application stated that the system would be installed by Robert Blouin, a licensed septic system installer. The Health Department issued the permit based on that application. (Exhibit L.)
On August 14, 1987, Mr. Kneen was called out to the site to inspect the system after it had been installed but before it had been covered over.
Based on Mr. Kneen's inspection, he concluded that the system had been properly installed. The distribution box had not yet been backfilled, so Mr. Kneen was able to see that the pipe connections were correct.
At the time of Mr. Kneen's inspection, the leach field appeared to be properly graded.
Mr. Kneen approved the septic system based on his inspection.
On August 18, 1987, four days after Mr. Kneen's inspection, Finn Survey issued an "as-built" survey showing that the septic system was properly located. The as-built survey did not show any improper grading in or around the leach CT Page 1972 fields. (Exhibit N.)
Prior to Mr. Kneen's inspection of the septic system, he was not aware that anyone other than the licensed installer, Robert Blouin, was working on the installation.
The public health code only required one inspection of a septic system: at the time that the system is installed, before it is covered over. That is the inspection which Mr. Kneen performed.
After Mr. Kneen's inspection of the septic system, the yard in front of the leach field was regraded to create a drop in the grade, and a row of boulders and stumps was left across the yard near the lower trench.
This cut in the grade and row of boulders and stumps was closer to the trenches than was allowed by the septic system design.
The Steigers were aware of the cut in the grade and the row of boulders and stumps across the yard at the time that they purchased their house.
The work on the row of boulders was part of the work for which the Steigers held back a portion of the purchase price of the house in escrow.
Before purchasing the house, the Steigers obtained a copy of the septic system design by Mr. Gerwick, which included the notation that there should be no cuts in the grade within fifty feet downhill from the lowest septic-system trench. (Exhibit 19.)
The Steigers' contract for construction and purchase of the house required them to pay additional compensation to the builder if he had to bring fill onto the property. (Exhibit W.)
The Steigers would have had to pay extra compensation to the builder in order to bring in fill to level out the yard downhill from the septic system.
The septic system went into use on October 1, 1987. CT Page 1973
The Steigers did not clean their septic system until 1993, over five years after starting to use the system. The Steigers had the system cleaned out because they were noticing that waste water was backing up into the washing machine outlet into the drain in the basement.
A failure to clean out a septic system can lead to solids spilling out of the distribution box into the perforated pipes in the trenches. When that happens, the perforated pipes will be permanently clogged and will no longer be able to leach effluent into the gravel in the trenches.
The Steigers' septic system consisted of a long upper trench and a half-length lower trench.
Had the septic system been installed improperly, it would have failed within the first year. The septic system showed no signs of failure for five years.
Mr. Kneen acted reasonably at all times with respect to his duties regarding the septic system installation at 293 Boston Post Road.
The actions by Joseph Hart and Frank Kneen regarding the Steigers' house required the exercise of discretion both in the inspection of the property and in interpretation and enforcement of state statutes and regulations.
Neither Joseph Hart nor Frank Kneen intended or anticipated any harm to the Steigers from their conduct.
The State of Connecticut has not reported any enforcement actions against either Eugene Rourke or John Slezak in connection with their installation of the Steigers' plumbing and septic system without the proper licenses.
The plaintiffs' own damages expert, Frederick Grillo, has been installing septic systems for years without a license. The state has never undertaken enforcement actions against him for his violations of the licensing statutes.
The only notice of intent to make a claim against the Town of Old Lyme under 7-465 was Exhibit V, a letter dated October 14, 1988. That letter referred only to a potential claim with respect to Joseph Hart; it made no mention of Frank CT Page 1974 Kneen.
The notice was filed with the clerk of the Town more than six months after the Steigers' cause of action accrued. (Exhibit V.)
The only evidence of damages due to the Steigers' occupancy as opposed to their purchase of the house related to the septic-gases in the house.
The Steigers claim that no contractor would be willing to perform work on their house short of bringing the entire house into compliance with the code, which would cost more than the funds available in the escrow. That claim is contradicted, however, by the actual conduct of their own contractor, Economy Oil, who did certain work on the system but left some building code violations uncorrected.
The plaintiffs' damages evidence was offered by Mr. Frederick Grillo, a contractor. Mr. Grillo offered his estimate of the cost to complete or correct the construction of the house in a number of different areas.
Mr. Grillo is not an expert on the requirements of the building code. Mr. Grillo's estimates related to the cost to correct items which he considered to be construction defects, rather than the cost of those items which were building code violations.
The plumbing system at the Steigers' house is the part of the house which has the most building code violations.
There are building code violations in the heating system in the Steigers' house, but those could have been corrected by the Steigers' heat contractor in 1987 out of the escrow funds.
All building code violations left in the heating system, including the unbalanced baseboard lengths in different rooms, could be corrected for $1,010.
The only defect in the electrical system at the Steigers' house which constitutes a serious health or safety problem was an improperly bonded ground wire, which could be corrected at a cost of $5. CT Page 1975
All of the remaining code violations in the electrical system could be corrected for $1,242.
All of the work necessary to correct the building code violations in the Steigers' house could be performed without requiring that they move out of the house.
There was evidence of the cost to replace the fireplace hearth extension, but there was no evidence that the defendant building official could or should have detected the defect in that work.
There was evidence of the cost to replace all the windows in the house, but no evidence that the existing windows violated the building code, that the building official detected any defects in the windows, or that a complete replacement of all the windows was necessary.
There was evidence that the builder failed to place a non-shrinking shim under the ends of the carrier beam in the basement, but that work could have been done easily by the Steigers when they occupied the house. There is no evidence of damage to the house from the failure to shim the carrier beam.
The plaintiffs offered evidence of other defects or alleged defects in the interior of the house, including a gap in the four inch "lip" between the garage floor and the livable portion of the house, an improper pitch in the garage floor, an improper placement of girders in the basement stairwell, and an alleged dip in the middle of the carrier beam. These were not detected by the Steigers' own inspector or listed in his twelve-page report. There is no evidence that the defendant building inspector was aware of any of these defects or that he reasonably should have detected them before the Steigers' purchase of the house.
Both parties' witnesses agreed that the building inspector was not required to inspect the foundation wall after waterproofing.
The plaintiffs seek damages for installation of a footing drain around the house. The evidence offered by both parties, however, was that building inspectors are not required to inspect the installation of footing drains. Further, there CT Page 1976 is no evidence that a footing drain was in fact required for the Steigers' house.
The plaintiffs seek damages for replacement of the roof of their house because the shingles installed by the builder do not overhang the edge of the roof. There is no evidence, however, that the defendant building inspector was aware of the missing overhang or that it was a required inspection or that it endangered the health or safety of the plaintiffs.
Joseph Hart believed that the Steigers intended to complete the grading of the rear yard when they installed a rear deck.
The plaintiffs seek damages for extensive site work behind the house, including retaining walls, curtain drains and terraces. None of those were required by code, however.
The plaintiffs seek damages to completely replace the septic system. There is no evidence, however, that the system was improperly installed.
Discussion of the Issues
The plaintiffs sued Mr. Hart in his capacity as building official of the Town of Old Lyme. They allege two counts, for negligence and recklessness, respectively, in connection with his inspections and alleged issuance of a certificate of occupancy for their house. The plaintiffs sued Mr. Kneen in his capacity as health director of the town. They again allege counts in negligence and recklessness in connection with Mr. Kneen's approval of the septic system for their house. The plaintiffs allege two counts against the Town of Old Lyme seeking indemnification of Hart's and Kneen's liability under Connecticut General Statutes 7-465.
Under Connecticut law, municipal officials are liable to private parties only in very limited circumstances.
The defendants Hart and Kneen are not liable because all of their actions were carried out in furtherance of state law and therefore fall within the protection of sovereign immunity. While Joseph Hart and Frank Kneen were at all relevant times employees of the Town of Old Lyme, the actions CT Page 1977 complained of by the plaintiffs relate exclusively to the enforcement of state statutes and regulations. All the plaintiffs' claims of misconduct by the defendants Hart and Kneen relate to supposed failure to properly enforce the state building code (promulgated pursuant to Connecticut General Statutes 29-252), the state public health code (promulgated pursuant to Connecticut General Statutes 19a-36), and related state statutes.
A number of Connecticut cases have explored the question of when a local body carrying out state mandated functions enjoys sovereign immunity as an agent of the state. In those cases, the courts have delineated a distinction between conduct related to state responsibilities and conduct related to local responsibilities.
"A town board of education can be an agent of the state for some purposes and an agent of the municipality for others." Heigl v. Board of Education, 218 Conn. 1, 4-5 (1991). "Local boards of education act as agents of the state when fulfilling statutory duties imposed upon them by the legislature. . ." R.A. Civitello Co. v. New Haven, 6 Conn. App. 212,218 (1986).
Not only were the defendants Hart and Kneen acting exclusively to enforce state codes, but state law also governs the qualification, training and discipline of local building officials and health directors. State law dictates that municipalities hire qualified building officials and establishes their powers and duties. Connecticut General Statutes 29-260 and 29-261. Building officials are licensed by the state. Connecticut General Statutes 29-262. The Connecticut building code controls all matters concerning building and structures in the state. It is the local building officers' primary responsibility to enforce the state code.
The state establishes a public health code that provides for the "preservation and improvement of the public health," including "drainage and toilet systems to be installed in any house or building arranged or designed for human habitation. . . ." Connecticut General Statutes 19a-36. State law establishes minimal education and training requirements for local health directors and requires each health director to file an annual report to the state. Connecticut General Statutes 19a-200, 244. CT Page 1978
State law dominates the regulation of building construction and protection of the public health in Connecticut. The municipality controls only incidental aspects of the health director's and building inspector's activities. Joseph Hart and Frank Kneen were acting as agents of the state in the course of all conduct complained of by the plaintiffs. The defendants are therefore entitled to the protections of sovereign immunity.
Hart and Kneen are not liable to the plaintiffs because they owed no duty to them as individuals, as opposed to the duty they owed to the general public. Unless there is a clear and unequivocal duty toward an individual rather than the general public, the duty will not support an individual action for damages. The public duty doctrine has a long history in Connecticut. See Leger v. Kelley, 142 Conn. 585, 589-90
(1955). The doctrine has been reaffirmed in several more recent Connecticut Supreme Court decisions. See, e.g., Shore v. Stonington, 187 Conn. 147, 152 (1982); Gordon v. Bridgeport Housing Authority, 208 Conn. 161 (1985).
The express intent of the Connecticut building code is "to insure public safety, health and welfare insofar as they are affected by building construction. . . ." BOCA Basic National Building Code/1984 100.4 (hereinafter "BOCA Code"]. (Exhibit DD.) (The BOCA Code as amended by the April 15, 1987 Connecticut Supplement constitutes part, of the Connecticut State Building Code.) A majority of jurisdictions follow the rule that since the "general purpose of building codes, building permits and building inspections is to protect the public, a building inspector is held to act exclusively for the benefit of the public." McQuillin, Municipal Corporations, (3rd ed. 1993) 53.88.
 [S]ervices such as inspections mandated by municipal building or fire codes or other inspection laws are considered as services provided to the public in general and are not services rendered to the particular individual. Such laws, it is said, are not to protect the personal or property interest of an individual, but on the contrary are designed to secure to the municipality as a whole the benefits of a CT Page 1979 well-ordered municipal government, or are for the benefit of the common good.
McQuillin, Municipal Corporations (3rd ed. 1993), 53.04.25. There are no statutes granting or referring to private causes of action against building officials or health directors. There are several statutes which address the public nature of their duties. The statutes provide for not only the qualifications of building officials, but also for review of their conduct and discipline and sanctions against any building official whose conduct violates those statutes. Connecticut General Statutes 29-262 (d). Similar provisions exist regarding local health officials, e.g., Connecticut General Statutes 19a-200, 319a-229.
Very closely related to the public duty doctrine, the ministerial/discretionary distinction provides immunity for acts which are performed for the direct benefit of the public and are discretionary in nature. In Connecticut, Supreme Court case law has held that enforcement of the health, housing and fire codes, which are very analogous to the building code, is discretionary as a matter of law. Evon v. Andrews, 211 Conn. 501
(1989). Decisions regarding whether an inspection is "reasonable, proper or adequate" and follow-up action after an inspection all involve the exercise of judgment.
The enforcement of the building code and public health code require the constant exercise of discretion and judgment. The range of discretionary decisions the local building official must make is especially great given the lack of meaningful guidance from the state building department on issues of administration of the building code. The exact limits of what must be done before occupancy have never been put in writing by the state, and therefore, are left to local officials to determine as best they can.
Even apart from those issues of interpretation of the code, the actual performance of an inspection and enforcement decisions are inherently discretionary.
A hurdle the plaintiffs must overcome as to the defendants Hart and Kneen is the "recklessness" requirement of the Tort Reform Act, Connecticut General Statutes52-557n(b)(7) and (8). The plaintiffs have not demonstrated that Mr. Hart and Mr. Kneen had the requisite state of mind to CT Page 1980 constitute a reckless disregard for the Steigers' health or safety, as required by the statute.
The plaintiffs must prove that Mr. Hart and Mr. Kneen consciously followed a course of action that posed a risk of harm to the plaintiffs and yet proceeded in spite of that awareness. "Recklessness is a state of consciousness with reference to the consequences of one's acts." Mooney v. Wabrek, 129 Conn. 302, 308 (1942). The plaintiffs must prove that Mr. Hart and Mr. Kneen actually did know of the risk of harm to the plaintiffs and acted in disregard of that risk.
The Connecticut Supreme Court, in Dubay v. Irish, establishes an even higher standard for recklessness. The court held that recklessness is equivalent to wanton and wilful conduct, which require not only awareness of a risk but an actual intent to engage in conduct which the actor expects will cause harm. Dubay v. Irish, 207 Conn. 518, 533 (1988). In a recent decision exploring the liability of building inspectors and other municipal officials, the court held that recklessness requires more than awareness of a highly dangerous condition, it also requires that the action producing the injury and the resulting injury itself was intentional. Fusco v. Colchester,9 Conn. L. Rptr. 526, 527 (1993).
The plaintiffs have not even suggested such an intent or awareness on the part of the defendants Hart and Kneen. They have merely used the word "reckless" in their allegations, an incantation which Connecticut courts have held is insufficient to raise an actionable claim of reckless and wanton misconduct. Kostiuk v. Queally, 159 Conn. 91, 94
(1970). The facts adduced at trial of these consolidated cases show that the defendants Hart and Kneen were trying to fulfill their duties.
The plaintiffs did not offer evidence that Mr. Hart knew that the plumbing was roughed improperly or soldered with lead. Nor is there evidence that Mr. Hart knew that the electrical ground would be bonded to the wrong pipe or that drains would be left uncapped so that septic gases could enter the house. Work continued on the Steigers' house after they moved in, and there was no way Mr. Hart could foresee at what point the plumber would stop work, or that the Steigers would then live in the house another six years without taking the minimal steps necessary to alleviate the smell. CT Page 1981
The plaintiffs challenge four principal areas of Joseph Hart's conduct: issuance of the plumbing and heating permits to an unlicensed contractor; failure to conduct a rough plumbing inspection; issuance of the certificate of zoning compliance; and failure to take enforcement actions after the Steigers moved into the house.
Mr. Hart's assistant, the late Katherine Greene, issued plumbing and heating permits to Eugene Rourke, a subcontractor or employee of J S Builders who did not have a valid plumber's license. Joseph Hart did not personally issue the permits, however. The plaintiffs did not sue Mrs. Greene, the person who issued the permits.
The plaintiffs can prevail only if Mr. Hart himself acted recklessly in establishing the procedure in his office for review of such subsidiary permits as the plumbing permit.
Section 112.1 of the state building code as amended by the Connecticut Supplement, Exhibit X states: "The building official shall examine or cause to be examined all applications for permits for . . ." (emphasis added) Similarly, 112.4 of the BOCA Code (Exhibit DD) states: "The building official's signature shall be attached to every permit; or the building official may authorize a subordinate to affix such signature thereto."
With respect to the employees the building official may authorize to review permits, 109.3 of the BOCA Code states: "The building official shall appoint such number of officers, technical assistants, inspectors and other employees as shall be necessary for the administration of this code and authorized by the appointing authority." While 109.5 of the Connecticut Supplement (Exhibit X) refers to Connecticut General Statutes 29-261 (a) for qualification of building department employees, that section establishes no requirements for staff persons such as Mrs. Greene. The BOCA standard forms for electrical and heating permits (Exhibit 16) themselves provide for those permits to be signed by a "permit clerk," and the BOCA code itself has no training requirements for that position. (BOCA Code 109.6, Ex. DD.)
The procedure Joseph Hart maintained in his office for issuance of trade permits was reasonable and consistent CT Page 1982 with the law.
The second area of Joseph Hart's conduct challenged by the plaintiffs was his failure to conduct a rough plumbing inspection. There was nothing unusual about the fact that the property was not ready for a rough plumbing inspection at the scheduled time, and there was nothing unusual or improper about Hart's decision to return to the property later when the rough plumbing was ready. There was nothing unusual or improper about his instruction to the contractor to call him back when the plumbing was ready.
The contractor did not call Mr. Hart back. That, however, was not Mr. Hart's conduct. Mr. Hart's trust and his reliance on the contractor was not out of the ordinary and was not reckless. Mr. Hart's reliance on Mr. Slezak to call him back for a rough plumbing inspection could not have been reckless, since there is no evidence that Mr. Hart knew at that point that Mr. Slezak was untrustworthy. The evidence is to the contrary, in that the plaintiffs themselves continued to trust Mr. Slezak's assurances until the closing on the house and beyond.
The plaintiffs also challenge Joseph Hart's issuance of the certificate of zoning compliance (Exhibit P) when he knew that the plaintiffs would use it to purchase the property and move in. When Mr. Hart signed the certificate of zoning compliance he believed that the house did not yet meet the requirements of the building code but did meet the requirements of the Old Lyme zoning regulations. He also believed that the Steigers themselves knew that the house was not yet complete. And he believed that the Steigers and their builder had agreed between themselves that the house would be finished after the Steigers moved in. He also believed that the Steigers were under great pressure to close on the purchase of the house as soon as possible. Joseph Hart did not believe that the Steigers were at any risk to their health or safety in moving into the house in the condition that it was in at that time.
The certificate of zoning compliance Mr. Hart signed (Exhibit P) did not constitute a certificate of occupancy either under the Connecticut statutes, Connecticut General Statutes 29-265 or the building code, 119.1 of the Connecticut Supplement (Exhibit X). It was not signed by the building official, but rather by the zoning enforcement CT Page 1983 officer. (The plaintiffs sued Mr. Hart only in his capacity as building official, not as zoning enforcement officer. Amended Complaint dated September 9, 1991, first count, paragraph 1.) It made no reference to compliance with the building code; instead, it referred only to compliance with zoning regulations.
Exhibit P is labeled "Certificate of Occupancy", That was the title chosen by the town's zoning commission when it designed the form, and by the town when it adopted its zoning ordinance. That ordinance (Exhibit 11, at page IV-A-5) requires the zoning officer to issue a "Certificate of Occupancy" when the property is found to satisfy the zoning regulations. Exhibit P was a document which Mr. Hart in his capacity as zoning officer was obligated to issue under town ordinances. That does not make it a certificate of occupancy for purposes of the building code or Connecticut General Statutes 29-265.
However critical the plaintiffs may be of Old Lyme's system of documenting certificates of zoning compliance and certificates of occupancy, the fact is that under the town's system it had not issued a building code certificate of occupancy until the green BOCA slip was signed and initialed in original ink in its upper right hand corner.
The plaintiffs may attack this system as being awkward or unclear, but the fact is that various towns in Connecticut have many different systems, developed independently in the absence of any guidance from the state. The reasonableness of the town's system of recording certificates of occupancy is not the issue, however.
The question presented in the case against Hart, Kneen and Old Lyme is whether a certificate of occupancy was in fact issued. None was ever issued for the Steigers' house.
The plaintiffs' real argument is not that the zoning certificate was a building code certificate of occupancy but that they were misled into believing that it was a building code certificate of occupancy. That is a claim against the builder who made the representations to the plaintiffs about the certificate, not a claim against the defendants Hart and Kneen. CT Page 1984
To the extent that the plaintiffs blame the defendants Hart and Kneen for the misunderstanding, they have sued the wrong parties. The plaintiffs' complaint clearly states that Hart is sued exclusively in his capacity as building official. The plaintiffs never sought to amend their pleading to restate their claim.
The plaintiffs, in CV89-510846S, concede that Mr. Hart believed that the Steigers' mortgage lender would accept the zoning compliance certificate as sufficient to allow a closing. But the Steigers' lender is not the plaintiff in this case. Further, that bank did its own inspection of the house before closing.
Mr. Hart did not intend to mislead the Steigers, and there is no evidence to suggest that he did. It is true that Mr. Hart trusted the builder. The Steigers claim that he should not have done so.
The reason why Mr. Hart followed the course of conduct he did is plain. The Steigers wanted to be able to purchase the house even though it was not ready. And as building officials sometimes do, he did what he could to accommodate them.
The plaintiffs' claim that Joseph Hart should have taken action after the plaintiffs' purchase of the property to force the builder to finish the house.
The Steigers did not pursue the administrative procedures suggested by Mr. Belval in the last paragraphs of his letter (Exhibit Q).
With respect to enforcement measures by Mr. Hart, the plaintiffs have not been able to identify any rule of law that would give a building official the authority to in effect issue an affirmative injunction requiring that the builder return to a property to perform additional work on the property. The plaintiffs' counsel referred to 120.7 of the Connecticut Supplement of the State Building Code (Plaintiffs' Exhibit X), which makes it a crime for someone to disobey a building official's order. That section does not state what orders a building — official may issue, however. Other sections of the code do give certain powers to the building official (e.g. BOCA Code 117.5, 120.3) but none of them would allow Mr. Hart CT Page 1985 affirmatively to order J S Builders, Inc. to return to Old Lyme to work on a construction project after the title, occupancy and control of the property passed to the plaintiffs.
The only authority a building official has is to grant or deny a permit, and grant or deny a certificate of occupancy. Once the plaintiffs purchased their house, there was nothing in Joseph Hart's power to do other than to withhold the certificate of occupancy until the Steigers finished the house.
The plaintiffs have sued Frank Kneen for his approval of their septic system. It is necessary to address his review of the design and installation of that system. First, with respect to his approval of the design for the septic system, there is every indication that Mr. Kneen handled the matter as well as he could have. He rejected two or three different designs before the one which he finally approved. And, before approving that one, he obtained a second opinion by another professional engineer.
With respect to the inspection of the system installation, the public health code requires only one inspection; and that was the one that Mr. Kneen performed. Section 19-13-B103e(g)(1) of the public health code states:
 The local director of health shall inspect all subsurface sewage disposal systems for compliance with Subsection 19-13-B103d and the approved plans for construction prior to covering and at such other times as deemed necessary.
As Kneen testified, the system was installed, but not yet covered over, so that he was able to see all of the pipe connections that he needed to see in order to know that the system was properly installed.
Apart from Mr. Kneen's own testimony about the proper installation of the system, the passage of time has proven that the system was installed correctly. Had the pipes not been properly connected or properly pitched, this system would have failed within the first year. Yet the system operated flawlessly for over five years without even being cleaned. CT Page 1986
The plaintiffs complain that Mr. Kneen did not report to the state that the system was apparently installed by an unlicensed contractor. There is no requirement in the statutes or the public health code, however, imposing a duty of reporting on the local health director. The enforcement power with regard to licensing of septic system installers lies with the state, not local building officials. Mr. Kneen did not have the power to withhold approval of the septic system solely on the grounds that it was installed by an unlicensed contractor. As the plaintiffs' own expert testified, unlicensed contractors often install perfectly adequate septic systems.
The plaintiffs claim that Mr. Kneen was responsible for the contractor's failure to grade the yard of the house after the installation of the septic system. The grading of the yard around the system was proper at the time of Mr. Kneen's inspection. Mr. Kneen had no reason to believe that the grading would not be properly done after he left. The as-built drawing for the septic system (Exhibit O) does not disclose any improper grading. It shows a row of hay bales across the yard, but does not show the row of boulders or retaining wall.
The evidence is that the septic system worked perfectly well until the plaintiffs allowed it to clog up by not cleaning it out within the first one to three years. The plaintiffs have not opened up the system to find what damage they have caused, but indications are that their failure to clean out the system caused the upper trench to clog up with solids, thereby putting an excessive burden on the lower trench. This, in turn, may have caused more effluent to spread out from the lower trench, including to the point in the boulders where Mr. Grillo allegedly detected effluent on one occasion in the early spring when the water table was high.
The Steigers have not taken the steps the law requires to limit their loss before they seek to impose that liability on others. Preston v. Keith, 217 Conn. 12, 15-16
(1991).
First, according to Ms. Swaney's log (Exhibit 19), in mid-September, Mrs. Steiger had a copy of the engineered plan for the septic system and could see the notation that required the fill downhill from the septic system for a distance of 50 CT Page 1987 feet. Two weeks later, Mr. Steiger noted the row of boulders in the septic field on his closing escrow list, Exhibit T.
Second, the Steigers were fully aware that the house was not complete at the time that they purchased it. Many of the items on their escrow list of defective or incomplete work were building code issues. Therefore, the plaintiffs either were actually aware or are deemed to be aware that the house did not meet the building code.
Third, the plaintiffs knew that they could call Joseph Hart if they had any questions about the house or its compliance with the building code. They had done that with respect to the location of the thermostat. They had learned from that experience that Mr. Hart would take their call, would answer them truthfully about the requirements of the building code, and would help them, in their own dealings with their contractor.
Fourth, the plaintiffs' own mortgage lender inspected the property before approving the closing and the issuance of the mortgage. A sophisticated institution which had a real interest in the quality of construction of the house found it to be adequate.
Finally, the plaintiffs were represented at closing by an attorney, who could have questioned the certificate of zoning compliance and what it meant in terms of the building code. At the closing, the plaintiffs could have called for a professional inspection of the house, as their own witness, Marvin Schaefer, said they should have done. They could have called for an inspection of the house by another contractor. They could have negotiated a higher escrow than the $3,000 which they agreed to.
By their actions or inactions, the plaintiffs waived their rights against the defendants Hart and Kneen. "Waiver is the voluntary relinquishment of a known right." MacKay v. Aetna Life Ins. Co., 118 Conn. 538, 547 (1934). Waiver of a right may be expressed by acts and conduct, as well as words. The plaintiffs intended to accept the consequences of buying an incomplete house when they proceeded with the closing. And, they knowingly accepted the risk that the $3,000 escrow would be insufficient to pay for the remaining work. CT Page 1988
The plaintiffs are also barred from asserting their claims by the doctrine of estoppel. "There are two essential elements to an estoppel — that party must do or say something that is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief, and the other party, influenced thereby, must actually change his position or do some act to his injury which he otherwise would not have done." First Connecticut Small Business Investment Co. v. Arba, 170 Conn. 168, 175 (1976).
The Steigers knew that the house was not complete; they saw many conditions which were building code violations. They could have notified Mr. Hart that the house had not been finished as they had expected it to be. They could have asked Mr. Hart whether it was proper to rely on the zoning certificate as evidence that the house satisfied the building code.
Similarly, the Steigers could have called Mr. Kneen about the row of boulders across their septic field on the morning of October 1, 1987, when they noted that problem on their escrow list. Instead, they proceeded to buy the house and called Mr. Kneen only after moving in. Had the Steigers called Mr. Kneen before buying the house, he could have helped them by pointing out the incomplete grading.
Counts five and six of the complaint are directed at the Town of Old Lyme. They allege that the town is liable under Connecticut General Statutes 7-465, which provides for indemnification by the town of municipal employees under certain circumstances. The plaintiffs do not allege any claim against the town other than the statutory cause of action in7-465.
Section 7-465 states that no action may be asserted against the municipality under that section
 unless written notice of the intention to commence such action and of the time when and the place where the damages were incurred or sustained has been filed with the clerk of such municipality within six months after such cause of action has accrued. CT Page 1989
The only notice given to the town with regard to the plaintiffs' claim is Exhibit V, a letter dated October 14, 1988, from Attorney Jefferson Hanna to the town clerk of Old Lyme. Thus, the notice was not given until more than one year after the plaintiffs purchased their house and their cause of action accrued. The requirements of the statute have not been met.
Moreover, the notice of claim in Exhibit V refers only to a potential cause of action against Joseph Hart. It makes no reference to any possible claim against Frank Kneen.
The plaintiffs' failure to provide timely notice defeats the purpose of the notice provision which is "to give the officers of the municipality such information as will enable them to make a timely investigation of the claim and to determine the existence and extent of liability." Fraser v. Henninger, 173 Conn. 52, 55, 376 A.2d 406 (1977).
The plaintiffs cannot contend that their cause of action accrued any later than October 1, 1987. Once they took title to the house and released the sales proceeds to the builder, the plaintiffs had incurred their damages, and the defendants Hart and Kneen could not take any action after that date to prevent the plaintiffs' loss.
There is another reason why the plaintiffs' claim under 7-465 must fail. That statute includes a limitation on the town's indemnification obligation relating to the state of mind of the employee involved. It states that the town shall be obligated to indemnify the employee "if such occurrence, accident, physical injury or damage was not the result of any wilful or wanton act of such employee in the discharge of such duty." As indicated above, the Connecticut Supreme Court has held that recklessness is the equivalent of wilful or wanton conduct under Connecticut law. Dubay v. Irish, supra,207 Conn. at 533. Therefore, a plaintiff who proved liability of a municipal official in connection with an inspection or certificate under the Tort Reform Act, would necessarily establish the "wilful or wanton" conduct which precludes indemnification under Connecticut General Statutes 7-465. Therefore, any liability of the Town of Old Lyme under the fifth and sixth counts of the complaint is barred by law. "The plain and unambiguous language of 7-465 provides that a municipality is not obligated to pay damages if the employee CT Page 1990 was acting in a wilful or wanton manner." West Haven v. Hartford Ins. Co., 221 Conn. 149, 156 (1992).
Virtually all of the damages claimed by the plaintiffs against Hart, Kneen and the town followed not from their occupancy of the house, but from their purchase of the house. Joseph Hart owed no duty to protect the Steigers' economic expectations in their contract with their builder. Mr. Hart's duties related only to injuries to their health and safety. Connecticut General Statutes 52-557n(b)(7) and (8).
The plaintiffs cannot recover their purely economic losses as against Hart because the building official has no duties with regard to the transfer of title to a property. The building official's only responsibilities have to do with the occupancy of buildings.
The purpose of building codes is to protect the health and safety of the public generally by setting minimum performance standards to be applied consistently throughout the state. The Supreme Court of Washington has stated "[B]uilding codes are designed to protect the public safety, health and welfare, not to protect individuals from economic loss caused by public officials while carrying on public duties." Taylor v. Stevens County, 759 P.2d 447, 452 (Wash. 1988). Similarly, the Florida Supreme Court has held that the building code was not "intended as a means to guarantee the quality of buildings for individual property owners or developers. We find that the enforcement of building codes and ordinances is for the purpose of protecting the health and safety of the public, not the personal or property interests of individual citizens." Trianon Park Condominium Association, Inc. v. Hialeah, 468 So.2d 912,922 (1985).
 Building codes, the issuance of building permits, and building inspections are devices used by municipalities to make sure that construction within the corporate limits of the municipality meets the standards established. As such, they are designed to protect the public and are not meant to be an insurance policy by which the municipality guarantees that each building is built in compliance with the building codes and zoning codes. CT Page 1991
Hoffert v. Owatonna Inn Towne Motel, 199 N.W.2d 158, 160
(1972).
The Steigers are trying to put the town and its officials in the position of an insurer or surety company which guarantees the performance of the Steigers' builder.
In Connecticut, the Tort Reform Act made it clear that no actionable duty is owed by a town official except with respect to the "health or safety" of persons. Connecticut General Statutes 52-557n(b)(7) and (8). Where no duty is owed there can be no liability. Shore v. Stonington, 187 Conn. 147,151-52 (1982); Burns v. Board of Education, 30 Conn. App. 594,598 (1993).
A general observation regarding damages relates to the plaintiffs' claim for emotional distress. Their distress apparently arises from the fact that they have lived in a house that had ambient septic gases for six years. Yet notwithstanding the availability of the escrowed funds, the many thousands of dollars that they have spent on attorneys and experts in this litigation and the $35,000 home equity loan which they obtained, they have not taken any steps to improve conditions in their own house. Their witness, Mr. Alves, said that their failure to correct the septic gas leak and electrical ground was reckless.
A general observation regarding damages relates to the narrow scope of liability of a building official. Under the Tort Reform Act, a building official is only liable for reckless disregard of health or safety. With regard to the lead solder used on plumbing joints, there is no evidence that Mr. Hart was aware that the plumber was using lead solder, and the state had not mandated that every building official have training on how to detect lead solder. Old Lyme, like many towns, did not have a lead solder test kit in its building department.
The plaintiffs notwithstanding the second well test have not submitted any evidence, invoices, bills or statements presumably regarding the necessity to purchase bottled water and have used the water from the existing driven well for six years plus with no apparent ill effects. CT Page 1992
The only evidence regarding damages offered by the plaintiffs was the testimony of Frederick Grillo.
First, the plaintiffs made no effort to identify what portion of Mr. Grillo's damages figures related to code requirements, even though the parties agree that the defendants Hart and Kneen owed no duty with regard to non-code issues. For example, Mr. Grillo's price for site work included not only grading the surface of the back yard away from the house, but also the installation of curtain drains, terraces and retaining walls, which are not required by code. His estimate for the heat system included replacing the boiler, even though he could give no reason for doing that. Moreover, the price for replacement of the septic system included inspection and removal of an electrical line, though the plaintiffs had withdrawn that claim.
Mr. Grillo's damages figures relates to the quality of work that he proposed. He testified that his prices reflected work to bring the house up to his personal standards, which was at least code level, but possibly higher. Grillo readily admitted that he did not know the code requirements for most of the work he proposed. The defendants Hart and Kneen were under no obligation, even according to the plaintiffs, to assure that their house was of a higher quality than required by code.
The plaintiffs' entire approach to damages illustrates their misconception of the law of municipal liability for building code and public health code violation as to Hart, Kneen and the Town of Old Lyme. The plaintiffs seem to believe that the town and its officers were guarantors of the performance of the Steigers' contractor.
Attorneys for the Council of Small Towns (COST) and the Connecticut Association of Municipal Attorneys (CAMA) at the outset of the trial made a motion to the court for permission to submit an amicus curiae brief in the case involving Hart, Kneen and the Town of Old Lyme because of the issues involved and concern for other building officials and sanitarians throughout the state.
The court reserved decision on the motion until the end of the trial, and after reflection and resorting to authority to consider such a request, the court granted the CT Page 1993 motion and a brief in due course was filed.
COST is a non-profit alliance of small communities in Connecticut created to share information and advocate for the interests of the Connecticut small towns. CAMA is a professional organization of lawyers practicing in the field of municipal law.
The qualified immunity enjoyed by Connecticut cities and towns has evolved through case law over the last seventy years and was largely codified by the legislature by the 1986 tort reform bill.
The most striking result of a careful review of the law in this field is that the preeminent concern of both lawmakers and jurists has been the broad societal implications of an expansion of municipal liability for conduct such as inspections and permit issuance. Despite numerous cases involving substantial loss of life and extensive property destruction, the overriding concern when this issue has been deliberated has been on insuring that government at all levels be allowed to perform its essential functions unfettered by a fear of liability for the negligent execution of any of its duties.
Both common sense, analogous case law in this jurisdiction and others, as well as leading treatises on municipal and tort law, hold that inspections or issuance or failure to issue certificates of occupancy are discretionary, governmental acts requiring the exercise of individual judgment. Such discretionary acts have consistently been held to be protected from liability by Connecticut courts at every level.
The general rule across the country as documented in McQuillan's treatise on municipal corporations is that a "municipality is generally not liable for the negligence of its public servants and in which the municipality itself has no private interest and from which it receives no special benefit or advantage in its corporate capacity. Thus, since the performance of such duties is a governmental function, the city is generally not liable for the negligence of a building inspector in the performance of "official duties." McQuillan's Law of Municipal Corporations, Sec. 53.88, page 89, Vol. 19, 3d Ed. (1993). CT Page 1994
Clearly, considerable professional judgment and discretion must be exercised by municipal officials such as defendants Kneen and Hart in applying complex building and health codes to the particular circumstances of each building or septic system they inspect. Just as the Shore court recognized the necessity for discretionary judgment by a police officer, the Connecticut courts have recognized the importance of similarly discretionary judgment by municipal officials performing inspection and permit issuance functions.
In a case quite similar to the dispute before this court, Judge Holzberg in Town of Plymouth, William MacDermid, Zoning Enforcement Officer, Christopher Laux, Building Official v. Edward Gebelein, Jr., 8 C.S.C.R. 68 (January 18, 1993), summarily rejected plaintiffs' claims of failure to enforce provisions of the building, fire and public health codes by finding: "defendant's claims are plainly barred by general statute 52-557n(b)(7) and (8), which confers immunity both on the municipality and the individual defendant.
A summary of law in other jurisdictions on the subject of municipal immunity which was developed by Attorney James Minor, Assistant Corporation Counsel for the City of Stamford, as part of his brief to the U.S. Supreme Court in the case of Bound Brook v. Norwalk, No. 85-1933, 1985 (cert. denied), repeats throughout the various statutory schemes articulated by the Idaho Supreme Court in Dunbar v. United Steelworkers of America, 602 P.2d 21 (Id. 1979).
 We do not ascertain or intend to create a new cause of action against a governmental entity for its attempts to govern. We postulate that if government is not able to govern, anarchy and chaos are the only alternatives. We are essentially concerned with the ability of officials, the enactment of regulations, and the enforcement of standards. A finding of liability for breach of those "duties" would create a new cause of action which we deem not to be contemplated by our legislature and foreign to traditional concepts of law of torts. CT Page 1995
A similar concern was expressed by the Illinois Supreme Court in Hannon v. Coulihan, 369 N.E.2d 917 (Ill. 1977).
 The plaintiff alleged that the village building inspector failed to make proper inspection so as to catch the noncompliance prior to the substantial construction of the house. The supreme court cited Illinois, New York, Washington state and Minnesota decisions stating that the statutory application of sovereign immunity still did not create any new cause of action and that the purpose of a building code is to protect the public in general, not specific individuals. "To recognize such a duty here would be to make a municipality substantially an insurer of all construction it undertook to inspect and control through its building code and would likely discourage all efforts at such control."
In the case of Bosch v. Hain, 445 A.2d 465 (N.J. 1982), the New Jersey Supreme Court cites the California Law Revision Commission on the issue of municipal liability for building inspection.
 Public entities and public employees should not be liable for failure to make arrests or otherwise to enforce any law. They should not be liable for failing to inspect persons or property adequately to determine compliance with health and safety regulations. Nor should they be liable for negligent or wrongful issuance or revocation of licenses and permits. The government has undertaken these activities to ensure public health and safety. To provide the utmost public protection, a governmental entity should not be dissuaded from engaging in such activities by the fear that liability may be imposed if an employee performs his duties inadequately. Moreover, if liability existed for this CT Page 1996 type of activity, the risk of exposure to which a public entity would be subject would include virtually all activities going on within the community. There would be potential governmental liability for all building defects, for all crimes and for all outbreaks of contagious disease. No private person is subjected to risks of this magnitude. In many of these cases there is some person (other than the public employee) who is liable for the injury, but liability is sought to be imposed on the government for failing to prevent that person from causing the injury. The commission believes that it is better public policy to leave the injured person to his remedy against the person actually causing the injury than it is to impose an additional liability on the government for negligently failing to prevent the injury.
 The court further cited a section of the California "Report of the Attorney General's Task Force on Sovereign Immunity" at page 214 (1972): `they were caught between the Scylla of making no inspection and the Charybdis of actively abating every failing which inspection uncovered — before harm resulted from that condition. Such a result would be unthinkable — short of legislative action which could provide mechanism for responding to the liability at the same time the duty is created.'
The court now turns its attention to the consolidated proceeding Steiger v. J. S. Builders, Inc., Blue Spruce Developers, Inc., Tradewinds Developers, Inc., the individuals John Slezak, Louisette Slezak and Susan Moreau.
Insofar as the above-noted defendants are concerned, the plaintiffs relied on the default entered against all these defendants by Teller, J. on April 12, 1991 for failure to plead and a subsequent default for failure to appear after the withdrawal of defense counsel on October 2, 1991 by Teller, J. CT Page 1997
Subsequently, plaintiffs' counsel made a motion for default and preclusion of evidence dated August 19, 1992 predicated on a long recitation of these defendants' failure to comply with orders of discovery and/or production and to appear and be deposed.
After a hearing before Teller, J., plaintiffs' motion of preclusion was granted in the following words: "Granted as to all defendants. . . . Grant the motion to preclude as to any evidence not already disclosed 11-9-92."
A motion to strike the file involving J. S. Builders, Inc., et al from the trial list was granted on March 4, 1993, and the file was claimed for a hearing in damages only.
Motions to set aside the defaults and preclusion order were denied by the court on June 9, 1993, Hurley, J.
Presumably, on the basis of the foregoing, the plaintiffs offered no evidence as to the status of any corporate defendant nor any of the individual defendants and addressed the issue of damages only.
Although it would have been helpful to the court, the plaintiffs offered no evidence as to the chain of title as to the three corporations nor did any title examiner testify. No records or documents of any sort from the Office of the Secretary of State, Corporations Section, were offered showing who were the officers, directors or stockholders of the corporations.
No tax records, federal or state, were offered as to the three corporations.
Plaintiffs did not call John Slezak, Louisette Slezak or Susan Moreau.
Plaintiffs did not call a representative from any assessor's office.
John Slezak was called by the defense, but due to objections, there was no testimony by him.
The only reference in the entire trial to Louisette Slezak was a mention of her being on the subject premises when CT Page 1998 the plaintiffs first viewed the lot.
No mention at all in the trial was made as to Susan Moreau.
The court notes the following from the building contract, Exhibit W.
The building contract is by and between the Steigers and J. S. Builders, Inc. It contains a reference to "property to be purchased by purchaser. . .". Paragraph 7 recites a builder's warranty against any defects in workmanship and materials for one year from completion of construction. The paragraph continues "for the purpose of this paragraph said date of completion shall be the date of issuance of a certificate of occupancy for said dwelling".
Paragraph 7 states ". . .shrinkage and settlement do not constitute defects . . . . Paragraph 8 states "payment of the price, issuance of the C.O. and sanitary discharge permit and taking of occupancy shall be evidence of acceptance of said construction as substantially complete"
As to the three corporate defendants, J. S. Builders, Inc., Blue Spruce Developers, Inc. and Tradewinds Developers, Inc., the defaults and preclusion orders are as previously noted and said corporations did not appear at time of trial and did not offer any evidence nor were any counsel for the corporations in attendance.
The three individual defendants did appear by counsel who were present throughout the entire trial.
The plaintiffs as to the individual defendants Slezak, Slezak and Moreau, seek relief under the theory of piercing the corporate veil.
It is a well-established rule of law in Connecticut that a default in an action for legal relief admits the material facts declared as constituting a cause of action, the plaintiff has a right to recover nominal damages, Starr Cash 
Package Car Co. v. Starr, 69 Conn. 440, 446, 37 A. 1057. Yet, the Starr Cash v. Starr case makes it clear that, if the plaintiff is not satisfied with nominal damages, he must proceed to prove the amount. In light of the theory of CT Page 1999 piercing the corporate veil, the plaintiff must show control or influence by an individual which resulted in harm to the plaintiff.
Piercing the corporate veil is an equitable remedy. The cases typically involve the actions of a single actor. The leading cases note that "the key factor is the element of control or influence exercised by an individual sought to be held liable." Zaist v. Olson, 154 Conn. 563, 227 A.2d 552
(1967), and Saphir v. Neustadt, 177 Conn. 1991, 413 A.2d 843
1979). In these cases, it is the actions of a particular individual which triggers the liability because there must be a causal connection between the control, committing of fraud, or breach of duty as a result of said control and the harm caused to the plaintiff. In Angelo Tomasso, Inc. v. Armor Construction and Paving, Inc., 187 Conn. 544, 447 A.2d 406
(1982), the court notes that liability is to be imposed on the real actor. The implication being that liability is not imputed to other directors unless they played an active role in the manipulation of the corporate entity. Furthermore, the United States Supreme Court has ruled that the mere fact that "one is an officer or director of a corporation does not per se render him liable for the fraud of other officers or directors." Briggs v. Spaulding, 11 S.Ct. 924, 141 U.S. 132,35 L.Ed. 662. Reading the Tomasso v. Armor Construction and Briggs v. Spaulding cases together, it is a reasonable inference that personal liability should only be imposed on a director or officer who through act of commission or omission, took part in the corporate veil activities which caused the plaintiff the harm alleged.
Quoting from the Tomasso, Inc. v. Armor Construction case, "courts will. . .disregard the fiction of a separate legal entity to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor. . . . We have affirmed judgments disregarding the corporate entity and imposing individual stockholder liability when a corporation is a mere instrumentality or agent of another corporation or individual owning all or most of its stock.
`In Zaist, we found the controlling stockholder and a related corporation liable under an `alter ego' theory, concluding that the corporate structure of the defendant in CT Page 2000 that case could properly have been disregarded under either the `instrumentality' rule or the `identity' rule. Zaist v. Olson, supra, 578.' Saphir v. Neustadt, 177 Conn. 191, 209-10,413 A.2d 843 (1979).
`The instrumentality rule requires, in any case but an express agency, proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.
The identity rule has been stated as follows: `If plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise.' Mull v. Colt Co.,31 F.R.D. 154, 163 (S.D.N.Y. [1962]); Walkovsky v. Carlton,24 App.Div.2d 582, 583, 262 N.Y.S.2d 334 [1965].' Zaist v. Olson, supra, 576.
The concept of piercing the corporate veil is equitable in nature. See Aetna Casualty Surety Co. v. Stover, 327 F.2d 288, 291 (8th Cir. 1964). `No hard and fast rule, however, as to the conditions under which the entity may be disregarded can be stated as they vary according to the circumstances of each case.'
`The circumstance that controls is exercised merely through dominating stock ownership, of course, is not enough.' There must be `such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal.' CT Page 2001
It is clear that the key factor in any decision to disregard the separate corporate entity is the element of control or influence exercised by the individual sought to be held liable over corporate affairs.
Ordinarily the corporate veil is pierced only under exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice.
It is true that courts will disregard legal fictions, including that of a separate corporate entity, when they are used for fraudulent or illegal purposes. Unless something of the kind is proven, however, to do so is to act in opposition to the public policy of the state as expressed in legislation concerning the formation and regulation of corporations.
The identity rule similarly offers the third party plaintiffs no relief. The evidence presented does not `show that there was such a unity of interest and ownership that the independence of the corporation had in effect ceased or had never begun, [such that] an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise.' Saphir v. Neustadt, supra, 210. The identity rule primarily applies to prevent injustice in the situation where two corporate entities are, in reality, controlled as one enterprise because of the existence of common owners, officers, directors or shareholders and because of the lack of observance of corporate formalities between the two entities.
The issue of whether the corporate veil is pierced presents a question of fact. Stark v. Coker, 20 Cal.2d 839,129 P.2d 390 (1942).
The court, in company with counsel and at counsel's request, traveled to Old Lyme and carefully and in an unhurried manner viewed and inspected the Steiger residence on October 6, 1993. The viewing was conducted in the afternoon on a clear day in good weather. The court estimated that it was on the premises at least one and one-half hours. CT Page 2002
The Steiger residence is set well back from the highway and access is over a gravel road. The setting is wooded and very pleasant.
The residence is of two stories, Dutch colonial garrison design, wood framed, exterior color Pilgrim blue, gambrel-type roof.
The residence was pleasantly decorated and tastefully furnished.
The court viewed on the first floor the living room, dining area, kitchen, family room and lavatory. On the second floor, all the bedrooms and the two baths. The court viewed the basement.
In the basement, there was a slight odor of mustiness and several damp areas on the floor.
One of the second floor bathrooms had a bad odor, the bathroom was all closed up and portions of the plumbing were not connected.
The master bathroom, second floor, had a hole in the floor behind the toilet installation. This had apparently caused the hole in the ceiling in the area of the first floor entry way.
Basement walls appeared basically smooth and sound.
The exterior grounds were still in a rather rough condition. Basically, no lawn or grassy areas.
The court observed a line of fairly large boulders presenting a wall-like appearance about 30 to 40 feet in front of the residence.
No odors or effluent were noted or observed in the open areas surrounding the residence.
The overall impression of the court is that of a basically sound structure with defects that are capable of reasonable resolution.
As to the various categories of damages claimed by CT Page 2003 the plaintiffs, the court makes the following observations and findings.
There are code violations in the plumbing system and the most economical way to bring the plumbing system up to code would be to remove it and replace it. The only reasonable credit worthy estimate for doing this is that of the witness McCarthy at a cost of $6,850. Defendant's Exhibit 21.
The plaintiffs offered no qualified expert witness with personal knowledge based on an in depth personal knowledge as to the cost of the plumbing work.
With regard to the heating system, the only credible testimony to correct any deficiencies was that of the witness McCarthy to the amount of $1,010. Defendant's Exhibit 21.
Plaintiffs' witness Grillo was not qualified in the heating system area and his proposal included a complete replacement including the boiler or furnace, clearly not justified. Grillo was not licensed to do this type of work.
As to the electrical system, the only defect was an improper ground which could be corrected for $5. Even plaintiffs' witness Marvin Schaefer, in his report, Plaintiffs' Exhibit FF at page 7, notes that basically all wiring was properly connected and wiring of approved type.
In order to accomplish the replacement of the plumbing system and any allied aspects of the heating system, some of the interior sheetrock has to be removed and replaced.
The credible testimony of the witness W. R. Allen indicates that this can be accomplished for $2,040. Defendant's Exhibit 17.
In addition, some removal and reinstallation of the vinyl clapboard siding is necessary for the plumbing access for the kitchen vent at a cost of $840. Defendant's Exhibit 17.
In addition, repainting the affected area ceilings and walls, $2,160. Defendant's Exhibit 7. Additional work regarding heat pipes, including sheetrock, painting and carpeting, $650. Defendant's Exhibit 17. CT Page 2004
Basement girder shim or support, $168. Defendant's Exhibit 17.
Corrective work concerning the removal, reinstallation, reinforcement of a new fireplace hearth, $1,060. Defendant's Exhibit 17.
Delivery and spreading of clay-type fill to complete the grade as to sanitarian's requirements concerning septic system fill, $2,926.50. Defendant's Exhibit 17. Footing drains are not required nor were they called for in the contract.
The septic system has functioned properly for five plus years and only requires periodic pumping out. No credible evidence was presented indicating a complete replacement was necessary nor have plaintiffs ever uncovered the same to determine its present state. There is no credible evidence justifying its replacement.
Repair and fill any snap tie holes in basement walls, $723. Defendant's Exhibit 17. Even plaintiffs' witness Schaefer acknowledged a good foundation. See Exhibit FF.
Install sonotubes for front step foundation, $318. Defendant's Exhibit 17.
Miscellaneous including protection of contents during work, clean up, dumpster, permits, etc., $1,750. Defendant's Exhibit 17.
To the aforementioned may be added 10 percent overhead, 10 percent profit and 6 percent Connecticut sales tax concerning the estimates by W. R. Allen only.
The court has carefully reviewed the estimate of the witness Grillo which totals $121,183.11. Grillo's approach was to gut the entire residence and start anew. The court cannot accept this approach nor is it justified, particularly after having had the opportunity to inspect and view the property. In addition, in many respects, Grillo was not qualified nor did he possess the requisite expertise or hold the proper licenses or permits. Furthermore, Grillo's approach was to please the plaintiffs in all and every respect and wish. CT Page 2005
The witness W. R. Allen also testified that the problem with regard to the roof drip or rake edge not extending beyond the edge could be solved by replacing the several lower courses of shingles for $720. A new roof so that there would not be any noticeable shading in contrast to the six-year shingles is not warranted nor justified.
The costs of the survey by Komnarski to define the driveway to the amount of $1,450 appears proper inasmuch as it discloses that a portion of the access driveway is on an adjoining lot. A proper deed or grant of easement is also in order conveying to Steiger a firm record foundation for the driveway which may be recorded in the land records.
Although plaintiffs offered evidence of moving and storage costs while work would be in progress on the premises, the court is satisfied that this is not necessary or required and any corrective measures can be undertaken without the owner plaintiffs being required to vacate.
As to the issue of punitive damages and attorney's fees. Plaintiffs claim damages under CUTPA, Connecticut General Statutes 42-110b et seq. CUTPA allows for both punitive damages and attorney's fees. A violation of CUTPA occurs when the conduct has a tendency or capacity to deceive and results in ascertainable loss. Aurigemma v. Arco Petroleum Products Co., 734 F. Sup. 102 (D. Conn.). There need not be proven an actual intent to deceive, just that the conduct have a tendency to do so. Covenant Radio Corp. v. Ten Eighty Corp.,35 Conn. Sup. 1 (1977). A single act is sufficient to support an action for CUTPA. Koehm v. Kuhn, 41 Conn. Sup. 130. The purpose of the act is to foster honesty and full disclosure in the conduct of business. Bailey Employment System, Inc. v. Hahn, 545 F. Sup. 62.
The evidence offered as to the conduct of Joseph Hart and Frank Kneen does not come close to the level which Connecticut law requires to support an award of punitive damages as to them.
Connecticut courts have offered little guidance in their published opinions regarding computation of fee awards but the Connecticut Appellate Court in Hernandez v. Monterey Village Associates, 24 Conn. App. 514 (1991) has referred with tacit approval to the federal standard enunciated in Johnson v. CT Page 2006 Georgia Highway Express, 488 F.2d 717 (5th Cir. 1974).
That case held that one of the criteria for the fee award is "the amount involved and the results obtained."
The results could have been obtained years ago if the plaintiffs had allowed their suit against the corporations and Slezak, et ux and Moreau to proceed to trial in Middletown instead of withdrawing it on the eve of trial there.
The plaintiffs claim and offered testimony as to attorney's fees as against Hart, Kneen and Old Lyme of $46,906 plus costs of $4,023.02, and as against the corporations and Slezak, et ux and Moreau of $22,267.50 plus costs of $2,845.57.
The court has carefully considered and reflected upon the credibility of all the testimony presented during this lengthy proceeding. The court has considered the demeanor of the witnesses, their candor or lack thereof, their opportunity to observe and interpret those observations, their interest, if any, bias or prejudice, expertise and/or training.
One of the most distressing aspects of the proceedings has been the almost total lack of any conduct on the part of the plaintiffs to mitigate damages.
As to the corporations Blue Spruce Developers, Inc., Tradewinds Developers, Inc. and J. S. Builders, Inc., the court has no difficulty by virtue of the defaults and preclusion and their failure to appear at trial in entering judgment against them as will be hereinafter noted.
Were it not for the preclusion order and the earlier denial to modify or vacate that order, the court would have some difficulty in entering judgment against Louisette Slezak and Susan Moreau and would have been inclined to follow the rationale in the Angelo Tomasso case, but because of the reason and cause for the preclusion order which was based on a failure of the individuals to comply with reasonable orders of production, inspection and appearance for disposition, the court feels it cannot do so.
The court is satisfied that the real principal actor was John Slezak, but the other individuals must be treated in the same vein by virtue of the foregoing. CT Page 2007
The court finds that the plaintiffs have not sustained or proved by a preponderance of the evidence their claims against the defendant Joseph Hart nor the defendant Frank Kneen, and by virtue thereof, must fail as against the Town of Old Lyme.
Judgment is entered in favor of the defendant Joseph Hart.
Judgment is entered in favor of the defendant Frank Kneen.
Judgment is entered in favor of the Town of Old Lyme.
By virtue thereof, no attorney's fees are awarded against Hart, Kneen or the Town of Old Lyme.
The court finds that the plaintiffs have sustained and proved some of their allegations against the defendants Blue Spruce Developers, Inc., Tradewinds Developers, Inc., J. S. Builders, Inc., John Slezak, Louisette Slezak and Susan Moreau by a preponderance of the evidence and by virtue of the defaults and the effect of the order of preclusion.
The above-noted corporations and individuals offered no evidence during the trial as to damages and the court resorts to and relies on the testimony offered by other parties on the issue of damages.
Judgment may enter in favor of the plaintiffs and against the defendants Blue Spruce Developers, Inc., Tradewinds Developers, Inc., J. S. Builders, Inc., John Slezak, Louisette Slezak and Susan Moreau as follows:
Replumb entire house to code $ 6,850.00
Separate items — heat incident thereto $ 1,010.00
Electrical $ 5.00
Sheetrock $ 2,040.00
Rear exterior siding $ 840.00
CT Page 2008 Repainting $ 2,160.00
 Additional sheetrock, repainting, carpeting $ 650.00
Basement girder shim $ 168.00
Fireplace hearth $ 1,060.00
Septic system clay fill $ 2,926.50
Foundation snap ties $ 723.00
Front step concrete pads $ 318.00
Roof rake edge $ 720.00
Miscellaneous $ 1,750.00
10 percent overhead $ 1,335.50
10 percent profit $ 1,335.50
6 percent sales tax $ 801.33
Komnarski survey $ 1,450.00
Total ...................................... $26,142.83
The court finds that the conduct of the defendant John Slezak clearly was contrary to public policy and was deceptive re: using an unlicensed plumber and that CUTPA has been violated.
The plaintiffs' claim for attorney's fees against the corporate and individual defendants Slezak and Moreau was for $22,000 plus costs.
On the basis of the cases noted above, this is clearly not warranted and would equal the damages the court is allowing as noted above.
There must be some reasonable relationship to the end result and attorney's fees. CT Page 2009
The court allows $7,500 for attorney's fees as against these defendants.
The amount of time and effort expended in this matter has been great. It is unfortunate that the original action against the builder in the Middlesex Judicial District was not pressed to a conclusion several years ago.
No punitive damages are awarded.
Austin, J.
CT Page 2009